MUELLER, Respondent, vs. CITY OF MILWAUKEE, Appellant.*

*May 9—June 4, 1957.*

* Motion for rehearing denied, with $25 costs, on September 10, 1957.

For the appellant there were briefs by *Walter J. Mattison,* city attorney, and *Peter M. Stupar,* assistant city attorney, and oral argument by *Mr. Stupar.*

For the respondent there was a brief and oral argument by *Jack A. Berland* of Milwaukee.

MARTIN, C. J.    At about 10:50 a. m. on February 10, 1954, Mueller was walking south between West Fiebrantz avenue and West Capitol drive along the east sidewalk of North Nineteenth place. He testified that because of the accumulation of melting snow and ice on the sidewalk he walked on an embankment of incrusted ice and snow in the parkway between the sidewalk and curb; that there was a path worn in the embankment which he estimated as approximately six inches high. When he had traveled about 35 feet on the parkway he broke through the snowbank, sustaining

injuries to his ankle. He was familiar with the sidewalk, having used it in walking to and from his work since 1942.

Appellant contends that there was no proof that an actionable defect existed in the sidewalk abutting the parkway where Mueller fell, that the place of injury was far removed from the defects in the sidewalk.

Survey charts were introduced in evidence giving detailed elevations in the slabs of the sidewalk both north and south of the spot where plaintiff fell. Most of the testimony was directed to the conditions south of the place of injury and the evidence is undisputed that the worst conditions, the differences in pitch and depressions and elevations, existed in the sidewalk in front of 4026. (See defendant's Exhibit 1 printed herewith; camera on north lotline of 4026 North Nineteenth place, facing south.) This is the portion of the walk toward which Mueller was walking when he fell.

EXHIBIT 1.

Mueller testified that the lawn on either side of the walk in the entire area between 4022 and 4032 was higher than the walk; that there was drainage from the snowbanks onto the walk and that there was no drainage from the sidewalk to the gutter; that the water would accumulate as deep as three inches in places; that "if it was bad, like it was that day I fell, the whole length of the sidewalk was water and snow and ice."

Jacob Berke, the surveyor who prepared one of the exhibits, also testified that the ground on both sides of the sidewalk was higher than the walk and "naturally water would accumulate on the sidewalk;" it was his opinion that from the elevations shown on the chart "water cannot run off" the sidewalk.

Sidney Voelkel testified the water was shoe depth on February 10th and the public made use of the lawn on either side of the walk or walked into the street around it; that "lots of times I have done it myself because the water was completely over the whole sidewalk and everything." Voelkel further testified that he went over the sidewalk early in the morning of February 10th and the water on it was frozen; when he returned in the evening he noticed it was "Slop. You know, slop with underneath slushiness, ice." Mueller likewise testified that there was ice underneath the water on the sidewalk and that the slabs pitched in all different directions in the area he sought to avoid by walking on the parkway.

From the evidence in the record the jury had the right to believe that while there may have been some of the sidewalk slabs that were level and dry, most of the walk that Mueller sought to avoid was beneath the level of the adjacent ground, the surface tilting in various directions and covered with an accumulation of water, melting snow, and ice.

Appellant maintains that the walk abutting the embankment where Mueller fell and north thereof was structurally

sound and not dangerous, relying on the testimony of John Wernette, one of the city's engineers, but there is nothing in Wernette's testimony which contradicts the evidence from which the jury could conclude that there was water on most of the sidewalk in question, including that in front of 4032 where, approximately, Mueller fell. Wernette testified in that respect:

"From the investigation I made and the elevations I took of the walk, the slabs south of the point and the worst condition became lower and I believe that the water would run to the south before it would back up to the north to such an extent as to leave three inches of water on that sidewalk in front of 4032."

According to Wernette, the worst or lowest spot on the sidewalk was between 4022 and 4026 where there was a five and five-eighths-inch difference between two opposite corners of one of the slabs.

The question whether this sidewalk condition constituted an actionable insufficiency or want of repair was a question for the jury. *Kawiecka v. Superior* (1908), 136 Wis. 613, 118 N. W. 192. The various elevations, depressions, and differences in pitch in the slabs of concrete constituted only one factor to be considered in determining that question. *Johnson v. Eau Claire* (1912), 149 Wis. 194, 135 N. W. 481; *McCormick v. Racine* (1938), 227 Wis. 33, 277 N. W. 646; *Pias v. Racine* (1953), 263 Wis. 504, 58 N. W. (2d) 67; *Krejci v. Lojeski* (1957), 275 Wis. 20, 80 N. W. (2d) 794.

In this case "other conditions and surrounding circumstances" to be considered included the height of the ground and snowbank levels above the walk, the drainage of melting snow onto the walk and the lack of drainage from the walk to the street, the depth of the water accumulated on the walk and the condition of the sidewalk surface under the water. And, as pointed out above, the jury was entitled to believe

the testimony that the accumulation of water extended over most of the sidewalk area between 4022 and 4032. It was not required to conclude that the dangerous condition was far removed from the place of injury. In effect, the jury found that the condition existing in the area in question was such as required Mueller to deviate. Otherwise it could not have found the defect causal, since the injury did not occur on the sidewalk.

Appellant suggests that the deviation was for Mueller's own convenience and the city cannot be held liable for an injury he sustained simply because he did not want to get his feet wet. The evidence required the jury to determine the question of necessity to deviate. It is not for us to say that walking through two to three inches of water involves no more than mere inconvenience or discomfort where the surface beneath is both uneven and icy. *Hawes v. Fox Lake* (1873), 33 Wis. 438, 442, 443, is distinguishable on its facts. The court there pointed out that the plaintiff's departure from the traveled way was entirely without demand or exigency of any kind; "No necessity for such deviation is claimed or shown, and the contrary thereof was proved at the trial." Nor can we apply the holding in *Goeltz v. Ashland* (1890), 75 Wis. 642, 44 N. W. 770, where there was no showing that the sidewalk was defective and the evidence was that the boy drowned when he deviated therefrom to fill a rubber ball and get a drink from the water into which he fell. Appellant also relies on *Welsh v. Argyle* (1895), 89 Wis. 649, 62 N. W. 517. There the driver of a team of horses chose to cross a stream by a ford during a freshet, instead of using an icy road, and the team was drowned. The icy road constituted no such obstruction to the travel it was meant to accommodate as did this stretch of icy, uneven, water-covered sidewalk to a pedestrian. In any event, as we have said, that was for the consideration of the jury, in the light of all the circumstances existing.

Appellant urges that the city should not be held liable for injuries which Mueller sustained because he chose a dangerous path along the embankment. The jury found Mueller negligent in its affirmative answer to question 4:

"Did the plaintiff fail to exercise ordinary care in leaving the sidewalk to walk on the embankment of snow and ice in the parkway between the sidewalk and curb?"

The proportion of negligence thus attributable to him was found to be 30 per cent. Appellant's argument is:

"Pedestrians must take precautions for their own safety. If there was any negligence, it was entirely the respondent's own. Certainly none of it can be ascribed to the city, which did not compel respondent to select a way of danger."

In the first place, we have upheld the jury's finding that the condition of the sidewalk necessitated deviation. Mueller's choice of an alternative, though negligent, does not relieve the city of liability. The comparison was for the jury.

Appellant cites a number of cases, all of which were decided prior to the enactment of the Comparative Negligence Law. In *De Pere v. Hibbard* (1899), 104 Wis. 666, 80 N. W. 933, and *Seaver v. Union* (1902), 113 Wis. 322, 89 N. W. 163, the injured parties were found contributorily negligent. In *Cooper v. Waterloo* (1898), 98 Wis. 424, 74 N. W. 115, on undisputed facts, the court held no defect in the sidewalk was shown. On the evidence in this case, that question was for the jury. In *Devine v. Fond du Lac* (1902), 113 Wis. 61, 88 N. W. 913, where the city had provided a boardwalk alongside an uneven and slippery sidewalk of stone flagging, the plaintiff chose to travel on the stonewalk instead of the safe alternative. In this case the city provided no such alternative.

Appellant argues that no notice of the defect was given but this argument is based on its contention that the defect was not located at the place of injury. In view of our holding

that the entire area was sufficiently defective to cause Mueller to seek another path, notice of the condition at the particular spot where he fell is immaterial. It may be noted, however, that the residents at both 4022 and 4032 had made complaint to the city regarding the walk in front of their homes; it is also undisputed that several of the slabs had been marked "out" and "X," the form of marking used by the city when a sidewalk is examined and it is determined that certain sections are to be removed and replaced. There can be no question that long before Mueller sustained his injuries the city had notice of the conditions existing, one witness testifying that for "maybe a year" before 1954 the "out" marks were on the sidewalk in front of 4022, and complaints having been made to the city as early as 1951.

*By the Court.*—Judgment affirmed.